# OCTOBER TERM, 1970

### ADVISORY OPINION *re* CONSTITUTIONALITY OF P.A 1970, NO 100

#### OPINION OF THE COURT

1. STATUTES—PRESUMPTION OF CONSTITUTIONALITY—COURTS.

   An act of the Legislature is clothed with a presumption of constitutionality and courts must scrupulously sustain the legislative will if within the constitutional limitations of its function.

2. STATUTES—INTENT OF LEGISLATURE—COURTS.

   The Michigan Supreme Court has a duty to give effect to the plain and clear intent of the Legislature irrespective of possible view of any Justice or Justices that such intent is unwise or impolitic.

3. STATUTES—CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS —COURTS.

   The intent of the Legislature in passing the State School Aid Act, being clearly, plainly and unambiguously stated, pre-

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law § 137 *et seq.*
[2] 50 Am Jur, Statutes § 223.
[3] 16 Am Jur 2d, Constitutional Law § 144 *et seq.*
[4–7, 9–32] 47 Am Jur, Schoools § 20 *et seq.*
   16 Am Jur 2d, Constitutional Law § 336 *et seq.*
[8] 50 Am Jur, Statutes § 219.

cludes resort to rules of construction and the sole function of the Supreme Court in passing upon the constitutionality of that statute is to determine whether such plain intent and concordant design is violative of constitutional principles, either Federal or state (MCLA § 388.665 *et seq.*).

4. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—RELIGIOUS INSTRUCTION—PUBLIC SCHOOLS.

   The only cases in which state educational programs have been held violative of the free exercise or establishment clause by the United States Supreme Court are those involving religious instruction or exercises in public schools.

5. STATUTES — CONSTITUTIONAL LAW — ESTABLISHMENT AND FREE EXERCISE CLAUSES — RELIGION — NEUTRALITY.

   The United States Supreme Court has consistently utilized the concept of neutrality which is required by the interplay of the establishment and free exercise clauses of the First Amendment, in drawing the line between the secular and sectarian, between legislation which provides funds for the welfare of the general public and that which is designed to support institutions which teach religion.

6. CONSTITUTIONAL LAW—SECULAR LEGISLATIVE PURPOSE—RELIGION —ADVANCEMENT—INHIBITION.

   To withstand the strictures of the establishment clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.

7. STATUTES—SCHOOLS AND SCHOOL DISTRICTS—LEGISLATIVE PURPOSE.

   The Michigan Supreme Court is concerned only with the legislative purpose and not the sectarian purposes of nonpublic schools and the fact that the State School Aid Act incidentally furthers the sectarian purposes of the individuals or organizations most directly affected does not render it constitutionally impermissible (MCLA § 388.665 *et seq.*).

8. COURTS — SUPREME COURT — LEGISLATURE — PUBLIC NEEDS — GENERAL WELFARE.

   Identifying and responding to legitimate public needs to suit the general welfare is for the Legislature and not the Michigan Supreme Court.

9. SCHOOLS AND SCHOOL DISTRICTS—SECTARIAN SCHOOLS—RELIGIOUS INSTRUCTION—SECULAR EDUCATION.

   Sectarian schools pursue the dual goals of religious instruction and secular education.

10. Schools and School Districts—Religious School—Compulsory Education—Secular Educational Requirements.

> Parents of a school-age child may, in the discharge of their duty under the compulsory education laws, send their child to a religious rather than a public school if the school meets the secular educational requirements which the state has the power to impose.

11. Schools and School Districts—Secular Education—Private Schools—States.

> The state, if it must satisfy its interests in secular education through the instrumentality of private schools, has a proper interest in the manner in which those schools perform their secular education function and the state's interest in secular education in those schools is a legitimate legislative concern.

12. Schools and School Districts — Teachers — Certified Lay Teachers — Secular Purpose.

> The purchase of the services of certified lay teachers teaching secular subjects in eligible nonpublic school units constitutes a secular legislative purpose.

13. Statutes—Schools and School Districts—Religion—Primary Effect—Constitutional Law.

> The State School Aid Act would be constitutionally infirm if it has a primary effect which either advances or inhibits religion (MCLA § 388.665 et seq.).

14. Statutes — Constitutional Law — Impermissible Effect — Religion — Government Involvement.

> The hallmark of the constitutionally impermissible primary effect of advancing or inhibiting religion is the excessive government entanglement with religion; the analysis of the State School Aid Act must be bottomed upon the questions of whether the involvement is excessive and whether it inherently requires continuing official participation or surveillance to effect an end which primarily advances or inhibits religion (MCLA § 388.665 et seq.).

15. Schools and School Districts—State School Aid Act.

> The State School Aid Act does not generally invest the state with new powers nor invest the eligible nonpublic school units with any new duties (MCLA § 388.665 et seq.).

16. Statutes—Schools and School Districts—State School Aid Act—Constitutional Law—Religion.

> No unnecessary or excessive governmental entanglement is perceived from the operation of the new but narrowly-drawn

provisions of the State School Aid Act which requires that eligible nonpublic school units: (1) maintain such accounting records as will enable the Department of Education at all times to ascertain that the allowances by the state were in fact used to pay the certified lay teachers teaching secular subjects and not for other purposes, (2) file a list of the certified lay teachers, their salaries and certification, and (3) certify that they are in compliance with the provisions of the Federal Civil Rights Act and Const 1963, art 8, § 2; therefore, once the appropriation is made and the eligible unit elects to participate in this voluntary program, the functional operation of the act is in essence ministerial and the primary effect of that legislation neither advances nor inhibits religion (MCLA § 388.665 *et seq.*).

17. CONSTITUTIONAL LAW—RELIGION—NEUTRALITY.

The general principle deducible from the First Amendment and all that has been said by the United States Supreme Court is that the United States Supreme Court will not tolerate either governmentally established religion or governmental interference with religion and, short of those expressly proscribed governmental acts, there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

18. CONSTITUTIONAL LAW—SCHOOLS AND SCHOOL DISTRICTS—TEACHERS—SECULAR SUBJECTS.

Nothing in the Michigan Constitution expressly prohibits the purchase of services of lay teachers teaching secular subjects in sectarian institutions (Const 1963, art 1, § 4).

19. SCHOOLS AND SCHOOL DISTRICTS—CONSTITUTIONAL LAW—RELIGION.

Nothing in the State School Aid Act conflicts with or in any way restricts an individual's exercise of the constitutionally guaranteed liberty to worship God according to the dictates of one's own conscience (Const 1963, art 1, § 4).

20. SCHOOLS AND SCHOOL DISTRICTS — STATUTES — CONSTITUTIONAL LAW — RELIGION — LAY TEACHER — SECULAR SUBJECTS.

The purchase of secular educational services cannot be construed to be support of a place of religious worship and any possible connection between the State School Aid Act and the erection and maintenance of a place of religious worship is so tenuous and indirect as to be meaningless; nor can any inference be drawn that a lay teacher teaching secular subjects is a

minister of the gospel or teacher of religion particularly when the act exempts such religious teachers (MCLA § 388.665 *et seq.*).

21. STATUTES — CONSTITUTIONAL LAW — RELIGION — SCHOOLS AND SCHOOL DISTRICTS.

Incidental benefits to religious sects or societies do not invalidate an otherwise constitutional statutory program plainly intended and formulated to serve a public purpose and there is no evidence, furnished or imaginable, that the people intended a strict "no benefits, primary or incidental," rule which would render religious places of worship and schools completely ineligible for all state services when they adopted the freedom of religion provision of the state Constitution (Const 1963, art 1, § 4).

22. CONSTITUTIONAL LAW — ESTABLISHMENT AND FREE EXERCISE CLAUSES — INTERPRETATION.

The sentences contained in art 1, § 4 of the 1963 Constitution, taken together, are an expanded and more explicit statement of the establishment and free exercise clauses of the First Amendment to the United States Constitution, the first and fourth sentences constituting the free exercise clause, and the second and third sentences constituting the establishment clause; accordingly, they are subject to similar interpretation (US Const, Am 1; Const 1963, art 1, § 4).

23. STATUTES—SCHOOLS AND SCHOOL DISTRICTS—STATE SCHOOL AID ACT—CONSTITUTIONAL LAW—SECTARIAN INSTITUTIONS.

The presumptive constitutionality of the State School Aid Act is sustained, since to do otherwise would be tantamount to repudiation of Federal authorities, as made binding by the supremacy clause of the Federal Constitution, and, to accept the arguments of opponents of that act, would sanction open hostility to sectarian institutions and violate the posture of neutrality incumbent upon the state in relation to sectarian institutions (MCLA § 388.665 *et seq.*).

DISSENTING OPINION

DETHMERS and ADAMS, JJ.

24. SCHOOLS AND SCHOOL DISTRICTS—FREE PUBLIC EDUCATION.
*Free public education for all is a responsibility of the state; it is state business (Const 1963, art 8, § 2).*

25. CONSTITUTIONAL LAW—RELIGION.
*Religion is the concern of each individual as he chooses to be so concerned and must not be interfered with by the state in*

*any way; it is private business (US Const, Am 1; Const 1963, art 1, § 4).*

26. SCHOOLS AND SCHOOL DISTRICTS—PRIVATE SECTARIAN SCHOOLS—
PRIMARY PURPOSE—RELIGIOUS EDUCATION—PUBLIC SCHOOLS.

*Private sectarian schools are dual purpose institutions that provide an education in subjects taught in public schools; but, their primary purpose and the reason they have come into being in lieu of the public school is to provide a religious education in a particular faith as public schools cannot teach religion.*

27. SCHOOLS AND SCHOOL DISTRICTS—PRIVATE SECTARIAN SCHOOLS—
RELIGIOUS ADVOCACY—PUBLIC ASSISTANCE.

*Religious advocacy places the private sectarian school beyond the pale of assistance from the public purse (Const 1963, art 1, § 4).*

28. SCHOOLS AND SCHOOL DISTRICTS—RELIGION—PRIVATE SCHOOLS.

*The state cannot do by indirection in private schools what it cannot do in its public schools—teach religion—nor can money be appropriated to private schools whose primary purpose is the teaching of religion since this obviously benefits a religious sect or society (Const 1963, art 1, § 4).*

29. STATUTES—SCHOOLS AND SCHOOL DISTRICTS—STATE SCHOOL AID
ACT—RELIGION—GOVERNMENT INVOLVEMENT.

*Chapter 2 of the State School Aid Act will cause an excessive government entanglement with religion (MCLA § 388.665 et seq.).*

30. SCHOOLS AND SCHOOL DISTRICTS—STATE SCHOOL AID ACT—NEW
POWER—NEW DUTIES—GOVERNMENT INVOLVEMENT.

*To say that the provisions of the State School Aid Act do not generally invest the state with new power or invest the eligible nonpublic school units with any new duties is to ignore the plain provisions of the act as, for example, the state must determine what constitutes membership in a religious order and what constitutes a distinctive habit under the definition of a certified lay teacher (MCLA § 388.665).*

31. SCHOOLS AND SCHOOL DISTRICTS—STATE SCHOOL AID ACT—PUR-
POSE—RELIGIOUS DISCRIMINATION.

*The stated purpose of the State School Aid Act will be nullified if the requirement of that act that a certificate of compliance with the constitutional provision that "every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin" is followed as all private sectarian schools will be unable to*

participate in the benefits of the act because such a school cannot provide for the education of its pupils "without discrimination as to religion", religion being the very purpose for the school's existence (Const 1963, art 8, § 2; MCLA § 388.665 et seq.).

32. SCHOOLS AND SCHOOL DISTRICTS—STATE SCHOOL AID ACT—CONSTITUTIONAL LAW.

The provisions of chapter 2 of the State School Aid Act, as they relate to sectarian schools, are violative of the Michigan Constitution of 1963 and the Constitution of United States (MCLA § 388.665 et seq.).

Request by the Legislature for advisory opinion as to constitutionality of PA 1970, No 100. Submitted August 17, 1970. (Calendar No. 15, Docket No. 52,933.) Statute declared constitutional September 1, 1970. Opinions filed October 5, 1970. Appeal dismissed for want of jurisdiction by the Supreme Court of United States March 1, 1971, sub nom. Smith v. Eastern Orthodox Churches of Greater Detroit.

Amici Curiae:

Stuart D. Hubbell, John Feikens, and Shlomo Sperka, for Eastern Orthodox Churches of Greater Detroit, Lutheran Schools of Michigan—Missouri Synod, Michigan Association of Non-Public Schools, Michigan Catholic Conference, Michigan Federation of Citizens for Educational Freedom, National Jewish Commission on Law and Public Affairs, and National Union of Christian Schools.

MacLean, Seaman, Laing & Guilford, for Michigan Education Association.

Harold R. Smith.

Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, for the Attorney General.

T. M. KAVANAGH, J.   We were requested by the
Legislature, pursuant to art 3, § 8, of the Michigan
Constitution of 1963, to pass upon the constitutional-
ity of chapter 2[1] of amendatory Act No 100 of the
Public Acts of 1970.[2]

This act of the Legislature comes before our
Court clothed with the presumption of constitution-
ality, and we must scrupulously sustain the legisla-
tive will if within the constitutional limitations of its
function.   1 Cooley, Constitutional Limitations, ch
4 (8th ed, 1927) ; *Evans Products Co.* v. *State Board
of Escheats* (1943), 307 Mich 506; *Beacon Club* v.
*Kalamazoo County Sheriff* (1952), 332 Mich 412;
*Gartland Steamship Company* v. *Corporation &
Securities Commission* (1954), 339 Mich 661, and
cases cited therein; *Munn* v. *Illinois* (1876), 94 US
113 (24 L Ed 77).

It is likewise incumbent upon our Court to give
effect to the plain and clear intent of the Legislature
irrespective of possible view of any Justice or
Justices that such intent is unwise or impolitic.
*C. F. Smith Co.* v. *Fitzgerald* (1935), 270 Mich 659,
671.

Turning to the specific provisions of the act, we
note that it provides for the purchase by the Depart-
ment of Education from eligible units[3] of educational

---

[1] MCLA § 338.665 *et seq.* (Stat Ann § 15.1919[105]).—REPORTER.

[2] Commonly called the State School Aid Bill, signed by the Gov-
ernor on July 20, 1970, and brought to our Court by House Concur-
rent Resolution No 535.   Reference hereinafter to the act shall be
understood to designate chapter 2 thereof.

[3] " 'Eligible unit' means a board of education, association or cor-
poration operating a nonpublic school or system of nonpublic schools,
which is complying with all educational standards as required by
law, has filed with the state department of education a certificate
that it complies with section 2 of article 8 of the state constitution
and title VI of the civil rights act of 1964 (Public Law 88–352) in
effect on December 1, 1969, has applied on a form provided by the
superintendent for aid provided by this chapter for the fiscal year
1970–71 by August 15, 1970 and for each succeeding fiscal year by
October 1 prior to the beginning of the fiscal year for which such
aid is sought and is certified by the superintendent as having sub-

services in secular subjects[4] at a cost of not to exceed 50 per cent of the salaries of lay teachers teaching secular subjects for the fiscal years 1970–1971 and 1971–1972 and 75 per cent of such salaries thereafter. The sum appropriated by the Legislature is limited to 2 per cent of the total expenditures from state and local sources for the support of the public primary and secondary education system in the last preceding fiscal year.[5] The payments are restricted to certified lay teachers[6] teaching secular subjects from textbooks meeting the criteria required of textbooks used in public schools. The act expressly prohibits payment or reimbursement for services to any teacher who is "a member of a religious order * * * or who wears any distinctive habit, or both" (§ 55, subd [b]) or for "any course of instruction

stantially complied with all state laws concerning evaluation of pupils and other laws applicable to nonpublic schools. If an application is not made it shall be conclusive evidence that an eligible unit does not desire to participate in the provisions of this chapter for that year." (Sec 55, subd [c].)

[4] " 'Secular subjects' means those courses of instruction commonly taught in the public schools of this state including but not limited to language skills, mathematics, science, geography, economics, history, as defined by the state department of education, which shall expressly not include any course of instruction in religious or denominational tenets, doctrine or worship or the primary purpose of which is to inculcate such tenets, doctrine or worship. Textbooks used in such secular subjects shall meet the same criteria as required of textbooks used in the public schools." (Sec 55, subd [d].)

[5] "The sum so appropriated shall not exceed 2% of the total expenditures from state and local sources for the support of the free public elementary and secondary public education system in this state in the last preceding fiscal year, as determined or estimated when necessary, by the superintendent from records available to him and financial accounting records of public school units maintained in accordance with rules promulgated by the state department of education. For the purpose of such limitation, total expenditures shall not include the amounts expended for bus transportation and auxiliary services for public and nonpublic school students. This appropriation shall not exceed $22,000,000.00 during the 1970–71 school year beginning July 1, 1970." (Sec 58.)

[6] " 'Certified lay teacher' means a teacher who holds a valid certificate or permit issued by the state to teach in the public schools of this state and is not a member of a religious order, who by vow or promise has chosen the religious life of poverty as a vocation or who wears any distinctive habit, or both." (Sec 55, subd [b].)

in religious or denominational tenets, doctrine or
worship or the primary purpose of which is to
inculcate such tenets, doctrine or worship." (Sec
55, subd [d].)

Participation under the act by nonpublic schools
(eligible units) is wholly voluntary. To qualify, an
eligible unit must file a timely application with the
Superintendent of Public Instruction, furnish appro-
priate certification listing lay teachers, their salaries
and their state certification status,[7] provide a com-
pliance certificate as to Title VI of the Federal
Civil Rights Act of 1964[8] and the Michigan constitu-
tional anti-discrimination clause,[9] and maintain an
accounting system segregating allowances attributa-
ble to payment of the certified lay teachers teaching
secular subjects.[10]

The intent of the Legislature in passing this law
is clearly, plainly and unambiguously stated in § 56
of the act:

---

[7] "Prior to the first day of the quarter for which payments are
due, an eligible unit shall certify to the superintendent on a form
prepared by him, a list of certified lay teachers teaching secular sub-
jects employed by such unit, the salaries and certification of each.
Where the superintendent finds that a certified lay teacher is provid-
ing less than a full schedule of instruction in secular subjects, he
shall allocate that part of the salary due such teacher for such
instruction in secular subjects and shall prepare a voucher for pay-
ment to the eligible unit for the allocated portion of the salary
of such teacher as provided in section 60. The superintendent shall
prepare appropriate vouchers and the state treasurer shall pay to
the eligible units the aggregate allowance for the salaries for the
teachers employed by the unit." (Sec 61.)

[8] 78 Stat 252 (1964), 42 USCA § 2000d: "No person in the United
States shall, on the ground of race, color, or national origin, be
excluded from participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity receiving
Federal financial assistance."

[9] "The legislature shall maintain and support a system of free
public elementary and secondary schools as defined by law. Every
school district shall provide for the education of its pupils without
discrimination as to religion, creed, race, color or national origin."
Mich Const 1963, art 8, § 2.

[10] "As an express condition of continued certification, the eligible
units shall maintain such accounting systems as will enable the
department at all times to ascertain that the allowances by the

"Sec. 56. The legislature finds that large numbers of children are being educated in nonpublic elementary and high schools in this state and further finds that increasing costs of education are impairing the quality of secular education of children enrolled in nonpublic schools lawfully selected by their parents. These schools perform, in addition to their sectarian function, the task of secular education. The legislature declares as public policy of the state that the public good and general welfare require that state appropriations now provided to public school districts under this act for the purpose of furnishing opportunities for public school children to secure a quality secular education be extended to assist in providing opportunities for quality secular education to children attending nonpublic elementary and high schools, as part of a general program to foster and encourage knowledge so as to provide a mature citizenry capable of contributing to good government, and to the safety and the economic and civil well-being of all the people of this state."

The intent, being so clearly expressed, precludes resort to rules of construction and our sole function at this juncture is to determine whether such plain intent and concordant design is violative of constitutional principles, either Federal or state.

I. The Free Exercise and Establishment Clauses of the First Amendment.

The First Amendment to the Federal Constitution provides in pertinent part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * * ."

---

state were in fact used to pay the certified lay teachers teaching secular subjects and not for any other purpose." (Sec 62.)

We should heed well, prior to embarking upon any constitutional interpretation, the advice most recently expressed by Mr. Chief Justice Burger in *Walz* v. *Tax Commission of the City of New York* (1970), 397 US 664 (90 S Ct 1409, 25 L Ed 2d 697), that it is a Constitution we are expounding and we must, therefore, judiciously refrain from relying upon sweeping utterances from other cases which may be appropriate to those cases but have limited meaning as general principles.[11]

The argument is often advanced that the United States Supreme Court has held unconstitutional all education benefits extended to nonpublic schools. The contrary is true for that court has upheld statutes providing textbooks (*Cochran* v. *Louisiana State Board of Education* [1930], 281 US 370 [50 S Ct 335, 74 L Ed 913]; *Board of Education* v. *Allen* [1968], 392 US 236 [88 S Ct 1923, 20 L Ed 2d 1060]) and bus transportation (*Everson* v. *Board of Education* [1947], 330 US 1 [67 S Ct 504, 91 L Ed 711, 168 ALR 1392]), for nonpublic school children, as well

---

[11] These sweeping generalizations have philosophical taproots deeply imbedded in the soil of our American history. See, for example, Madison's "Memorial and Remonstrances Against Religious Assessments" reproduced in *Walz, supra,* and extensively analyzed and discussed by Mr. Justice Rutledge in *Everson* v. *Board of Education* (1947), 330 US 1, at 33–43 (67 S Ct 504, 91 L Ed 711, 168 ALR 1392). While our pragmatic orientation embraces the observation of Mr. Justice Holmes that "a page of history is worth a volume of logic" (*New York Trust Company* v. *Eisner* [1921], 256 US 345 [41 S Ct 506, 65 L Ed 963, 16 ALR 660]), over-reliance upon the historical analysis, necessarily divorced from its creative facts, is misdirected for the several reasons well expressed by Mr. Justice Brennan concurring in *School District of Abington Township* v. *Schempp* (1963), 374 US 203, at 237–240 (83 S Ct 1560, 10 L Ed 2d 844).

We should, rather, read these broad statements as expressive of fundamental objectives of a constitutional design. See the discussion of Mr. Justice Goldberg concurring in *Schempp, supra,* at p 305, and see, also, *Walz, supra,* at p 668.

Mr. Justice Douglas, writing for the court in *Zorach* v. *Clauson* (1952), 343 US 306 (72 S Ct 679, 96 L Ed 954), noted that, "The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State." (P 312.)

as statutes involving "released time" for attendance at religious instructions or devotional exercises off the premises of public schools (*Zorach* v. *Clauson* [1952], 343 US 306 [72 S Ct 679, 96 L Ed 954]). The only cases in which state educational programs have been held violative of the free exercise or establishment clause by the United States Supreme Court are those involving religious instructions or exercises *in public schools*. *McCollum* v. *Board of Education* (1948), 333 US 203 (68 S Ct 461, 92 L Ed 649, 2 ALR2d 1338) (religious instruction in public schools); *School District of Abington Township* v. *Schempp* (1963), 374 US 203 (83 S Ct 1560, 10 L Ed 2d 844) (Bible reading in public schools); *Engel* v. *Vitale* (1962), 370 US 421 (82 S Ct 1261, 8 L Ed 2d 601, 86 ALR2d 1285) (reading of prayer in public schools). Accordingly, ritualistic invocation of the nonconstitutional phrase "separation of church and state" will not suffice. What is compelled is an analysis of just what the "neutrality" is which is required by the interplay of the establishment and free exercise clauses of the First Amendment.[12]

In drawing the line between the secular and sectarian, between legislation which provides funds for the welfare of the general public and that which is designed to support institutions which teach religion, the United States Supreme Court[13] has consistently utilized the concept[14] of neutrality. This

---

[12] See Justice Stewart's dissenting opinion in *Schempp*, *supra*, at p 313.

We note well in the context of Mr. Justice Jackson's observation in *Everson*, *supra*, at p 21, that the Federal Constitution says nothing of education. It lays no obligation on the states to provide schools nor undertakes to regulate any system so established.

[13] For a collection of state constitutional analogues to the free exercise and establishment clauses, see Gabel, Public Funds for Church and Private Schools, pp 148, 149. See, also, 2 Cooley, Constitutional Limitations, ch 13 (8th ed, 1927).

[14] The same concept obtains although variantly expressed. See Mr. Justice Brennan's formulation in *Schempp*, *supra*, at p 231, and

concept of neutrality was well described by the Court in *School District of Abington Township* v. *Schempp, supra*:

"The wholesome 'neutrality' of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits. And a further reason for neutrality is found in the Free Exercise Clause, which recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state. This the Free Exercise Clause guarantees. Thus, as we have seen, the two clauses may overlap." (P 222.)

The application of the concept to the facts of the case or controversy is tested by the standard implied in *Everson,* recognized in *Schempp,* reiterated in *Allen,* and applied most currently in *Walz*:

"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause *there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.*" (*Schempp, supra,* p 222.) (Emphasis added.)

Applying the first factor of this two-fold test—the "secular legislative purpose"—we observe that

---

compare with that of Mr. Justice Goldberg concurring in *Schempp,* at p 306, or Mr. Justice Black in *Everson,* at pp 15, 16.

it is only the *legislative purpose* with which we are concerned and not the sectarian purposes of nonpublic schools. The fact that the enactment incidentally furthers the sectarian purposes of the individuals or organizations most directly affected does not render it constitutionally impermissible.

It is for the Legislature and not this Court to identify and respond to legitimate public needs to suit the general welfare. The leading authority in this jurisdiction as to what constitutes a public purpose is *The People ex rel. The Detroit and Howell Railroad Co.* v. *The Township Board of Salem* (1870), 20 Mich 452, 475, where Justice COOLEY said:

"I do not understand that the word *public,* when employed in reference to this power, is to be construed or applied in any narrow or illiberal sense, or in any sense which would preclude the Legislature from taking broad views of State interest, necessity or policy, or from giving those views effect by means of the public revenues. Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statemanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people."

See, also, *Miller* v. *State Apple Commission* (1941), 296 Mich 248, 254; *Hays* v. *Kalamazoo* (1947), 316 Mich 443.

The expansion in the scope of legislative activities which may be classed as involving a public purpose to conform to the changing conditions of society has been sustained in *City of Gaylord* v. *Gaylord City Clerk* (1966), 378 Mich 273.

Our Legislature has spoken forthrightly in § 56 of its desire to foster, improve and advance the quality of secular education, wherever offered, as an integral element of the public welfare. This salutary and beneficent intent and design, moreover, is not a hastily conceived desire to subsidize any or all denominationally-sponsored schools nor a plan effecting a type of "religious gerrymandering," but rather the product of extensive and in-depth studies and investigations under the aegises of both the executive[15] and legislative[16] branches to develop and upgrade a comprehensive system of secular education extant in our state.

It is beyond dispute that sectarian schools pursue the dual goals of religious instruction and secular education (*Pierce* v. *Society of Sisters* [1925], 268 US 510, 532 [45 S Ct 571, 69 L Ed 1070, 39 ALR 468]) and that the parents of the school age child may, in the discharge of their duty under the compulsory education laws, send their child to a religious rather than a public school if the school meets the secular educational requirements which the state has the power to impose. *Everson, supra,* at p 18. From this delicate balance of the individual's right to private education and the state's exercise of the police power emerged the determination that if the state must satisfy its interest in secular education through the instrumentality of private schools, the state has a proper interest in the manner in which those schools perform their secular education function and that the state's interest in secular educa-

---

[15] See, *e.g.*, the joint efforts of the executive and legislative branches culminating in the Michigan School Finance Study (commonly referred to as the Thomas Report) under the direction of the Executive Department of Education and financed by the Legislature (PA 1966, No 285). See, also, the Governor's Commission on Educational Reform Report submitted on October 30, 1969.

[16] See, *e.g.*, Joint Legislative Committee Report on Nonpublic Schools, 1969 Legislative Session.

tion in those schools is a legitimate legislative concern. It was thus concluded by the Court in *Allen, supra,* at pp 247, 248:

"Underlying these cases, and underlying also the legislative judgments that have preceded the court decisions, has been a recognition that private education has played and is playing a significant and valuable role in raising national levels of knowledge, competence, and experience. Americans care about the quality of the secular education available to their children. They have considered high quality education to be an indispensable ingredient for achieving the kind of nation, and the kind of citizenry, that they have desired to create. Considering this attitude, the continued willingness to rely on private school systems, including parochial systems, strongly suggests that a wide segment of informed opinion, legislative and otherwise, has found that those schools do an acceptable job of providing secular education to their students. This judgment is further evidence that parochial schools are performing, in addition to their sectarian function, the task of secular education."

The continuing and intensifying financial crisis which now afflicts all education in this country, particularly nonpublic school education, raises serious doubts as to whether nonpublic schools can continue to properly perform their "task of secular education." *Allen, supra,* at p 248. We take note of the fact that a large number of nonpublic schools have closed during the last year and are continuing to close at an increasingly alarming rate.[17] These closings are adding to the public schools' financial

---

[17] For instance, in 1965 there were 10,879 Catholic elementary schools in the United States, at which 4,492,107 pupils were in attendance. In 1969 the number of elementary schools was 10,338, and 3,902, 487 pupils attended those schools. Catholic Education Today: An Overview, Office of Public Information, NCEA (1969).

educational crisis.[18]   Under these circumstances it is clear that chapter 2 serves a public purpose.

In view of the express recognition of these factors in the act here involved and the declared public policy upon a matter of general welfare and in view not only of the recent pronouncements of the Federal Courts on this subject[19] but also well-established congressional enactments in cognate fields,[20] we must conclude that the purchase of the services of certified lay teachers teaching secular subjects in eligible units constitutes a secular legislative purpose.

Turning to the second factor of the *Schempp-Allen* test, we must determine whether the act has a primary effect which either advances or inhibits religion, and if we find that it does we must declare the act to be constitutionally infirm.

As observed by Mr. Justice Douglas, concurring in *Schempp*, this constitutionally impermissible effect may be accomplished in various ways—some blatant, some insidious—but all designed to achieve one end:

"Establishment of a religion can be achieved in several ways.  The church and state can be one; the church may control the state or the state may control the church; or the relationship may take one of several possible forms of a working arrangement between the two bodies.  Under all of these

---

[18] Estimates of School Statistics 1969–1970, NCEA (1970); Estimates of School Statistics 1969–1970, copyrighted 1969 by the National Education Association. The increase attributable to the enrollment in New York public schools in 1969–1970 of students who formerly attended Catholic schools has been estimated to be over $100,-000,000 for the 1969–1970 school year. *Ibid.*

[19] For current pronouncements on this issue, see *Lemon* v. *Kurtzman* (ED Pa, 1969), 310 F Supp 35, probable jurisdiction noted (1970), 397 US 1034 (90 S Ct 1354, 25 L Ed 2d 646).

[20] See, *e.g.*, 20 USCA § 445 (direct loans to private elementary and secondary schools for purchase of equipment and minor remodeling).

arrangements the church typically has a place in the state's budget, and church law usually governs such matters as baptism, marriage, divorce and separation, at least for its members and sometimes for the entire body politic. Education, too, is usually high on the priority list of church interests. In the past schools were often made the exclusive responsibility of the church. Today in some state-church countries the state runs the public schools, but compulsory religious exercises are often required of some or all students. Thus, under the agreement Franco made with the Holy See when he came to power in Spain, 'The Church regained its place in the national budget. It insists on baptizing all children and has made the catechism obligatory in state schools.'

"The vice of all such arrangements under the Establishment Clause is that the state is lending its assistance to a church's effort to gain and keep adherents." (Pp 227, 228.)

See, also, the dissenting opinion of Mr. Justice Fortas in *Allen, supra,* at pp 270–272.

Review of the authorities and most significantly the application of the test in *Walz, supra,* discloses that the hallmark of the constitutionally impermissible effect is the excessive government entanglement with religion. *Walz, supra,* at p 674. Cognizant of the fact that the test is inescapably one of degree, our analyses must be bottomed upon the questions of whether the involvement is *excessive and whether it inherently requires continuing official participation or surveillance* to effect an end which primarily advances or inhibits religion.

Reviewing the provisions of the act under consideration, we note that the act does not generally invest the state with new powers nor invest the eligible units with any new duties. The nonpublic schools have long been subject to state inspection

and control over most nonsectarian aspects of their existence. They must meet the same requirements with regard to qualifications of teachers,[21] construction and safety of buildings,[22] sanitary conditions,[23] fire drills and equipment,[24] instruction of handicapped students,[25] selection of textbooks to recognize ethnic-group achievements,[26] and language of instruction[27] as are imposed on public schools. They must periodically file reports with state agencies regarding the attendance[28] and immunization[29] records of their students. Their secular curriculum must be comparable to that of local public schools at the same age and grade level[30] and must include instruction in the Constitutions and history of our state and national governments.[31] They must admit representatives of the department of education in order to facilitate inspection of sanitary conditions, enrollment records, courses of study and teacher qualifications.[32] The vast extent of the present supervisory authority of the Department of Education over nonpublic schools is best indicated by the fact that it includes the power to close nonpublic schools for failure to comply with orders enforcing the above requirements.[33]

There appear to be only three aspects of the act which could be denominated as conditions and these deal with the implementation and enforcement of the act itself, rather than impose new involvements by

---

[21] MCLA § 388.553 (Stat Ann 1968 Rev § 15.1923).
[22] MCLA § 388.851 (Stat Ann 1968 Rev § 15.1961).
[23] MCLA § 388.551 (Stat Ann 1968 Rev § 15.1921).
[24] MCLA § 29.19 *et seq.* (Stat Ann 1969 Rev § 4.559[19] *et seq.*).
[25] MCLA § 388.558 (Stat Ann 1968 Rev § 15.1928).
[26] MCLA § 340.365a (Stat Ann 1968 Rev § 15.3365[1]).
[27] MCLA § 340.360 (Stat Ann 1968 Rev § 15.3360).
[28] MCLA § 340.738 (Stat Ann 1968 Rev § 15.3738).
[29] MCLA § 340.376 (Stat Ann 1968 Rev § 15.3376).
[30] MCLA § 340.732 (Stat Ann 1968 Rev § 15.3732).
[31] MCLA § 340.361 (Stat Ann 1968 Rev § 15.3361).
[32] MCLA § 388.555 (Stat Ann 1968 Rev § 15.1925).
[33] MCLA § 388.554 (Stat Ann 1968 Rev § 15.1924).

the state or burdens upon the eligible units.  The first condition requires the eligible units to maintain such accounting records "as will enable the department at all times to ascertain that the allowances by the state were in fact used to pay the certified lay teachers teaching secular subjects and not for any other purpose."  (Sec 62.)  Second, the eligible units must file a list of the certified lay teachers, their salaries and their certification.  (Sec 61.)  Third, the eligible units must certify that they are in compliance with the provisions of the Federal Civil Rights Act and Michigan Const 1963, art 8, § 2.

We do not perceive from the operation of the new but narrowly-drawn provisions, in addition to the many well-established provisions, any unnecessary or excessive government entanglement.  Once the appropriation is made and the eligible unit elects to participate in this voluntary program, the functional operation of the act is in essence ministerial.  We conclude, from the nature and operation of the act under consideration, that the primary effect of this legislation neither advances nor inhibits religion.

As previously pointed out, careful analysis will disclose that every pertinent United States Supreme Court case holding a legislative act to be constitutionally infirm directly involved distinctive religious exercises in public schools.  The principles and operational forms of accommodation between the state and sectarian institutions are well set out by Mr. Justice Brennan in *Schempp, supra,* at pp 243–304, and it would be pedantic to add to this scholarly analysis.  It will suffice to observe the comment of Mr. Chief Justice Burger in *Walz* at p 669:

"The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either govern-

mentally established religion or governmental interference with religion.  Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference."

II. THE MICHIGAN CONSTITUTIONAL PROVISION.

The 1963 Constitution of our state provides in art 1, § 4:[34]

"Every person shall be at liberty to worship God according to the dictates of his own conscience.  No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. . No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."[35]

A close reading of this section discloses nothing, nor do the opponents of the act point out anything, which expressly prohibits the purchase of the services of lay teachers teaching secular subjects in sectarian institutions.  Any constitutional attack on this act must, therefore, be grounded upon a necessary implication of the pertinent section.

[34] Religion is also mentioned at the beginning of the Education Article (art 8, § 1): "Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

[35] This section was copied verbatim from the Constitution of 1908. Some of its provisions can be found in the Constitutions of 1835 (art 1, §§ 4, 5) and 1850 (art 4, §§ 39–41).

The first sentence of art 1, § 4, guarantees the liberty to worship God according to the dictates of one's own conscience. Nothing in the act conflicts with or in any way restricts an individual's exercise of this right.

Assuming, without deciding, that the second sentence of art 1, § 4, is applicable to legislative appropriations,[36] we cannot construe the purchase of secular educational services to be support of a "place of religious worship." Any possible connection between the act and the erection or maintenance of a place of religious worship is so tenuous and indirect as to be meaningless. Nor can any inference be drawn that a lay teacher teaching secular subjects is a "minister of the gospel" or "teacher of religion,"[37] particularly when the act exempts such religious teachers.

As we pointed out in our discussion of the Federal constitutional question, "incidental benefits" to religious sects or societies do not invalidate an otherwise constitutional statutory program plainly intended and formulated to serve a public purpose. The same rule must apply to our interpretation of the third sentence of art 1, § 4. To adopt a strict "no benefits, primary or incidental" rule would render religious places of worship and schools completely ineligible for all state services. There is no evidence, furnished or imaginable, that the people

---

[36] On its face the sentence restricts only action directed toward or taken by individual "person(s)." It may be that the second sentence, therefore, applies only to individuals while the third sentence restricts state action. We find it unnecessary to decide the point because the act conflicts with neither sentence even if both are read as restricting state action.

[37] This is true regardless of whether these terms are given their contemporary (1963) definitions or those commonly attached to them when they were first used in the 1835 Constitution. See *Pfeiffer* v. *Board of Education* (1898), 118 Mich 560, wherein it is concluded that "religious teacher" meant "minister" when the term was first inserted in a Michigan Constitution.

intended such a rule when they adopted this provision of the Constitution. Furthermore, a strict "no benefits" rule might result in direct conflict with the final sentence of art 1, § 4, which guarantees that no person shall have his rights, privileges and capacities diminished or enlarged on account of religious beliefs.

Taken together, these sentences are an expanded and more explicit statement of the establishment and free exercise clauses of the First Amendment to the United States Constitution, the first and fourth sentences constituting the free exercise clause, and the second and third sentences constituting the establishment clause. They are, accordingly, subject to similar interpretation.

Adhering to the general principle spoken of in *Walz, supra,* and applying the test formulated in *Everson, Schempp* and *Allen, supra,* we sustain the presumptive constitutionality of the act before us. To do otherwise would be tantamount to repudiation of the Federal authorities as we understand them and as made binding by the supremacy clause of the Federal Constitution. To accept the arguments of the opponents of the act would sanction open hostility to sectarian institutions. This violates the posture of neutrality incumbent upon the state in its relation to sectarian institutions.

We, at the outset, presume the act to be constitutional and upon inquiry of the relevant authorities and application of the approved tests and criteria, and nothing to the contrary having been disclosed, we are of the opinion that the act before us conforms to the Federal and state Constitutions.

It is hardly necessary to add that no part or portion of this opinion may be taken or construed as having determined any possible question which may arise hereafter with reference either, (a) to the

validity of submission to the people of any future amendment of our Constitution, or (b) of construction or application of any such future amendment.

T. E. Brennan, C. J., and Black and T. G. Kavanagh, JJ., concurred with T. M. Kavanagh, J.

Adams, J. (*dissenting*).

## I

Free public education for all is a responsibility of the state. It is state business. Art 8, § 2, Constitution of 1963. Religion is the concern of each individual as he chooses to be so concerned and must not be interfered with by the state in any way. It is private business. Art 1, § 4, Constitution of 1963; First Amendment to the United States Constitution. Religions have flourished or waned according to the conscience of the individual and the strengths or weaknesses of the particular religion.

Some religions have provided private schools to teach and perpetuate a particular religion. Religious education is a support and an adjunct to the religion. Chapter 2 of the State School Aid Act, as added by PA 1970, No 100 (MCLA § 388.665 *et seq.;* Stat Ann § 15.1919[105] *et seq.*), proposes to augment the services of the public school system of this state by contractual agreements with private schools for the education of students in those schools in subjects taught in the public schools.

It is said that it is necessary to supplement the public school system because it cannot meet the challenge of serving the needs of the children of this state if the sectarian schools are forced to close. Beginning with such admission of failure, the state is asked to surrender its constitutionally-imposed duty of providing public schools for the children of

this state to those religious groups that can afford private schools with the help of the public treasury.

Private sectarian schools are dual purpose institutions.[1]  As a condition of their existence and because they are so required by the state, they provide an education in subjects taught in public schools.  Their primary purpose and the reason why they have come into being in lieu of the public school is to provide a religious education in a particular faith.[2]  The public schools cannot teach religion.  *McCollum* v. *Board of Education* (1948), 333 US 203 (68 S Ct 461, 92 L Ed 649, 2 ALR2d 1338); *School District of Abington Township* v. *Schempp* (1963), 374 US 203 (83 S Ct 1560, 10 L Ed 2d 844).  Consequently, the child who is taught in the public schools must be guided by his parents or his church or himself or look elsewhere in choosing his religion.

The child taught in a private sectarian school receives an education as provided by the public schools and a religious education in the faith of a particular religion.  Such religious advocacy places the school beyond the pale of assistance from the public purse.  Art 1, § 4, Constitution of 1963, states: "No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society * * * ."  What the state cannot do in its public schools—teach religion—it cannot do by indirection in private schools, nor can money be appropriated

---

[1] This opinion refers to sectarian schools rather than private non-sectarian schools since Chapter 2, in § 56, speaks of the "sectarian function" of the private schools to be benefited.

[2] In the case of *Walz* v. *Tax Commission of the City of New York* (1970), 397 US 664 (90 S Ct 1409, 25 L Ed 2d 697), the court said (p 671):

"Surely, bus transportation and police protection to *pupils who receive religious instruction* 'aid' that particular religion to maintain schools that *plainly tend* to *assure future adherents to a particular faith* by having control of their total education at an early age. *No religious body that maintains schools would deny this as an affirmative if not dominant policy of church schools.*"  (Emphasis added.)

to private schools whose primary purpose is the teaching of religion since this obviously benefits a religious sect or society.

## II

Chapter 2 will cause "an excessive government entanglement with religion." *Walz* v. *Tax Commission of the City of New York* (1970), 397 US 664 (90 S Ct 1409, 25 L Ed 2d 697). In that case, the Supreme Court of the United States, speaking through Chief Justice Burger, said (p 675):

"Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards   *   *   *  ."

Chapter 2 provides for yearly application for funds (§ 55[c]). It contemplates an annual appropriation from the general fund to the Department of Education (§ 57). The sum so appropriated is to be used by the Department of Education to purchase from eligible units educational services (§ 59). Within the limit of the appropriation for a particular year, the superintendent is required to pay to eligible units, in quarterly installments, a percentage of the salaries of certified lay teachers within each teaching unit. If total actual cost of service rendered by an individual teacher exceeds actual cost of comparable service in comparative public schools, the State Board of Education must disapprove the total actual cost as to such teacher and make no further payment until a redetermination that the total actual cost does not exceed the total actual cost of comparable service in such public schools. When a statewide budget system becomes operational,

amounts paid for salaries must not exceed 75% of the salary allowances adopted by the legislature for comparable professionals in local school district budgets (§ 60).   Prior to the first day of the quarter for which payments are due, eligible units must certify a list of lay teachers to the superintendent who must make certain determinations with regard to the allocation of salary for each teacher.   The superintendent must prepare appropriate vouchers and the State Treasurer must pay to the eligible units in accordance with the same (§ 61).   The eligible units must maintain accounting systems to enable the department at all times to ascertain that the allowances by the state were in fact used to pay the certified lay teachers (§ 62).   The Department of Education is required to promulgate rules to carry out the provisions of Chapter 2 (§ 63).   Anyone aggrieved by not having been declared an eligible unit may proceed as in a contested case (§ 64).

The above is but a brief summary of some of the provisions of Chapter 2.   All of its provisions must be examined to determine the full extent of the pregnant involvement between private sectarian schools and the state.   See especially sections 57 through 64.[3]

---

[3] "Sec. 57.   A sum necessary to fulfill the requirements of this chapter is appropriated from the general fund to the department of education for the fiscal year ending June 30, 1971, and for each fiscal year thereafter.

"Sec. 58.   The sum so appropriated shall not exceed 2% of the total expenditures from state and local sources for the support of the free public elementary and secondary public education system in this state in the last preceding fiscal year, as determined or estimated when necessary, by the superintendent from records available to him and financial accounting records of public school units maintained in accordance with rules promulgated by the state department of education.   For the purpose of such limitation, total expenditures shall not include the amounts expended for bus transportation and auxiliary services for public and nonpublic school students.   This appropriation shall not exceed $22,000,000.00 during the 1970–71 school year beginning July 1, 1970.

"Sec. 59.   The sum so appropriated shall be used by the depart-

To say, as Justice T. M. Kavanagh states in his opinion, that the provisions of the act do not generally invest the state with new power or invest the eligible units with any new duties is to ignore the

ment of education to purchase from eligible units educational services in secular subjects for the benefit of pupils attending eligible units.

"Sec. 60. Within the limit of the appropriation under this chapter for a particular fiscal year, the superintendent shall pay to an eligible unit, in quarterly installments, a sum not to exceed in the fiscal years 1970–71 and 1971–72, 50% of the salaries of certified lay teachers within such unit teaching secular subjects and in the fiscal years thereafter 75% of such salaries. If the state board of education determines that if the total actual costs of such educational service rendered by such individual is in excess of the total actual cost of comparable educational service rendered in approximately like circumstances of geographical area and economic condition in the public schools, the state board of education shall disapprove the total actual cost of such educational service rendered by such individual and no further payment shall be made to such individual until the state board of education makes a redetermination that the total actual cost for such educational service does not exceed the total actual cost of comparable educational service in such public schools. When a statewide budget system becomes operational, the amounts paid for such salaries shall not exceed 75% of the salary allowances adopted by the legislature for the purpose of determining such allowances for comparable professionals in local school district budgets in a particular fiscal year.

"Sec. 61. Prior to the first day of the quarter for which payments are due, an eligible unit shall certify to the superintendent on a form prepared by him, a list of certified lay teachers teaching secular subjects employed by such unit, the salaries and certification of each. Where the superintendent finds that a certified lay teacher is providing less than a full schedule of instruction in secular subjects, he shall allocate that part of the salary due such teacher for such instruction in secular subjects and shall prepare a voucher for payment to the eligible unit for the allocated portion of the salary of such teacher as provided in section 60. The superintendent shall prepare appropriate vouchers and the state treasurer shall pay to the eligible units the aggregate allowance for the salaries for the teachers employed by the unit.

"Sec. 62. As an express condition of continued certification, the eligible units shall maintain such accounting systems as will enable the department at all times to ascertain that the allowances by the state were in fact used to pay the certified lay teachers teaching secular subjects and not for any other purpose.

"Sec. 63. This chapter shall be administered by the department of education which shall promulgate rules to carry out the provisions of this chapter in accordance with and subject to the provisions of Act No. 306 of the Public Acts of 1969, being sections 24.201 to 24.313 of the Compiled Laws of 1948.

"Sec. 64. Prior to the beginning of each fiscal year the superintendent shall prepare a list of eligible units. Anyone aggrieved by

plain provisions of the act. To cite only one example, the act defines a certified lay teacher as follows:

"Sec. 55(b).  'Certified lay teacher' means a teacher who holds a valid certificate or permit issued by the state to teach in the public schools of this state and is not a member of a religious order, who by vow or promise has chosen the religious life of poverty as a vocation or who wears any distinctive habit, or both."

The state must, under this definition, determine what constitutes membership in a religious order and what constitutes a distinctive habit. The previous regulation of private schools referred to by Justice T. M. KAVANAGH is of quite a different sort, being designed to require private schools to meet the same standards as are imposed upon public schools.

In the case of *DiCenso* v. *Robinson* (D RI, 1970), 316 F Supp 112, a three-judge United States District Court, speaking through Judge Coffin, analyzed and applied the Federal standards to a situation similar to the one in this case, is summarized at US LW 2023 as follows:

"The appropriate standard to be used in this case is the purpose and effect test first enunciated in Abington School District v. Schempp, 374 US 203 (1963): '[W]hat are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of the legislative power as circumscribed by the Constitution. That is to say to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.' The purpose of the statute in this case was not intended to advance or interfere with reli-

not having been declared an eligible unit may proceed as in a contested case within the meaning of Act No. 306 of the Public Acts of 1969 to have his status determined."

gion. The quality of education in the non-public schools is a legitimate legislative concern.

"It is more difficult to determine the statute's primary effect. The opponents of the statute argue that 'primary' means 'essential' or 'fundamental.' The statute's defenders claim that 'primary' means 'first in order of importance.' The problem of definition is critical in this case since the statute has two significant effects: it aids the quality of secular education; it provides support to a religious enterprise. *To examine only the activities of the teachers receiving aid and ignore the religious nature of the schools in which they teach is an unrealistic approach.* The expenses of a religious institution may be apportioned in a variety of ways among its secular and religious activities, and sophisticated bookkeeping could pave the way for almost total subsidy of religious institution by assigning the bulk of the institution's expenses to secular activities. Equally important, government aid to purely secular activity could nevertheless involve the state deeply in the workings of religious institutions.

"These deficiencies in Schempp were recognized in Walz v. New York City Tax Comm., 38 LW 4347 (U.S. 1970). That case stated that '[e]ach value judgment under the Religious Clauses must * * * turn on whether the particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so.'

"This test refines Schempp by removing the suggestion that the single predominant effect of the statute may be isolated by a process of deductive reasoning based upon principle and precedent. Instead, the focus is on whether the statute fosters excessive entanglement between government and religious institutions and whether the degree of entanglement is likely to promote the substantive evils against which the First Amendment guards.

"Two significant dangers are apparent in the effect of this statute. The Act authorizes a subsidy

which, unlike the exemption involved in Walz, must be annually renewed. Efforts of the various sects to obtain government financing of those few denominations that support school systems will inevitably excite bitter controversy. Also, significant state subsidies will inevitably produce significant state limitations on the freedom of denominational schools. A direct subsidy such as this requires greater administrative involvement between church and state than the payment of transportation costs involved in Everson v. Board of Education, 330 U.S. 1 (1947), or the loaning of textbooks in Board of Education v. Allen, 392 U.S. 236, 36 LW 4538 (1968). Under this statute, the commissioner of education could and must monitor parochial school expenditures and in close cases determine which spending is religious and which is secular. Equally important, this statute promotes a type of involvement that may significantly limit the internal freedom of parochial schools. The Act has already restricted the role of teachers. Some otherwise qualified teachers have stopped teaching courses in religion in order to qualify for statutory aid." (Emphasis added.)

## III

Finally, § 55(c) of Chapter 2 requires a certificate from each applying unit of compliance with § 2 of art 8 of the Constitution of 1963, the second sentence of which reads:

"Every school district shall provide for the education of its pupils *without discrimination as to religion,* creed, race, color or national origin." (Emphasis added.)

If this requirement of § 55(c) of Chapter 2 is followed, it will nullify the stated purpose of the act as all private sectarian schools will be unable to participate in the benefits of the act. The hallmark of the private sectarian school is that it teaches a

particular religion and maintains a particular religious environment. Such a school cannot provide for the education of its pupils "without discrimination as to religion," religion being the very purpose for the school's existence.

Chapter 2 is violative of the Michigan Constitution of 1963 and the Constitution of the United States.

DETHMERS, J., concurred with ADAMS, J.

KELLY, J., took no part in the opinions filed in this case.

